UNITED STATES DISTRICT COURT FOR
THE DISTRICT COURT OF COLUMBIA

| | | |
|---|---|---|
| ANN MARIE MOGENHAN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 98-CV- |
| | ) | 0817(RWR/DAR) |
| JOHN W. SNOW, SECRETARY, | ) | |
| U.S.  DEPT. OF TREASURY, | ) | |
| | ) | |
| Defendant. | ) | |

**...oOo...**

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff Ann Marie Mogenhan moves the Court for an order denying Defendant's Motion for Summary Judgment.  For the reasons set forth in the accompanying Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, there are material facts that are genuinely disputed and Plaintiff is entitled to have her case go before a jury as a matter of law.

A proposed Order and Statement of Disputed Material Facts are attached.

\_\_\_\_/s_____
Morris E. Fischer, Esq. (MD: Bar No. 26286)
Ari Taragin, Esq. (MD: Bar No. 27409)
Snider & Fischer, LLC
104 Church Lane, Suite 201
Baltimore, Maryland 21209
410-653-9060 phone
410-653-9061 fax


Attorneys for Plaintiff, Ann M. Mogenhan

UNITED STATES DISTRICT COURT FOR
THE DISTRICT COURT OF COLUMBIA

| | | |
|---|---|---|
| ANN MARIE MOGENHAN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 98-CV- |
| | ) | 0817(RWR/DAR) |
| JOHN W. SNOW, SECRETARY, | ) | |
| U.S.  DEPT. OF TREASURY, | ) | |
| | ) | |
| Defendant. | ) | |

**...oOo...**

## NATURE OF THE CASE

In this case, Ann M. Mogenhan ("Plaintiff") was a dedicated and loyal employee of the United States Department of Treasury ("Agency" or "Defendant").  Ms. Mogenhan began working for the Agency in 1990.  During the course of her employment, Plaintiff was subject to repeated gender and disability discrimination by management.  When Plaintiff complained to the management and engaged in protected activity, the Agency started a campaign of retaliation against her.

Because there are genuine issues of material fact surrounding the unlawful discrimination and retaliation against the Plaintiff, she respectfully requests that summary judgment be denied and that the case be brought before a jury.

## PLAINTIFF'S STATEMENT OF DISPUTED MATERIAL FACTS

Pursuant to Local Rule 7(h), Plaintiff respectfully submits this statement of material facts to which there are genuine disputes.

A.    <u>Work Application</u>

1)  Plaintiff applied for her a job with the Defendant in 1989 and was interviewed in January 1990. See Exhibit A, Supplemental Investigative Data in Employment Application.   <u>See also</u> Exhibit 1, Defendant's Responses to First Request for Admissions of Facts and Genuineness of Documents, Response #4.

2)  In her background investigation materials, Plaintiff included her medical condition of migraine headaches. Id.

3)  During her in-person interview in January 1990 with Mr. Machado, her first-line supervisor, Plaintiff expressly told him about her medical condition of heat triggered migraines and discussed the ventilation and temperature in the office.  See Exhibit B, ROI at 85, 86.  See also Exhibit C, Hearing Transcript Vol. 1 at 231,232. See also Exhibit D, Deposition of Plaintiff at 62-63.

4)  Plaintiff also had a subsequent phone conversation with Machado after the face-to-face interview about the heat triggered migraines and her previous low leave balance due to missed time, as a result of her condition.   See Exhibit E, Supplemental Affidavit of Plaintiff.

5)  Plaintiff also discussed her migraine condition with the United States Secret Service ("USSS") Special Agent who was assigned to assist Plaintiff with her background investigation paperwork.  Id.

6)  When filling out her background investigation paperwork, Plaintiff was asked to fill out the Standard Form 177-103 and called this assigned USSS Special Agent for help.  She was told to fill it out the best that she could, that the questions were

inappropriate, and that the questions were tailored for law-enforcement positions. Id.

7) Plaintiff was also told that since she had put the Workman's Compensation information in her background investigation paperwork, she did not need to worry about Form 177-103.  Id.

8) Prior to her employment, Plaintiff's first line supervisor, John Machado, circulated her job application to other employees and stating that these were the credentials he was looking for in employees.    Id.

9) Mr. Machado had knowledge of Plaintiff's application and was aware of her prior leave record which showed she missed a lot of work time, but chose to overlook it. See Exhibit B, at 103.  See also Exhibit F, Hearing Transcript Vol. III,  38-39.

10) When calling in sick, Plaintiff would also tell Mr. Machado that she had a migraine. See Exhibit B, at 112.

11) Plaintiff began working for the Defendant, as a Management Analyst in September 1990.  See Exhibit B, at 73.


B.    Medical History of Plaintiff

11) Plaintiff was diagnosed in 1985-1986 with heat triggered migraines caused by poor ventilation.  See Exhibit B at 85. See also Exhibit C, at 77, 78.  See also Exhibit #2, Letter from Dr. William Speed dated January 17, 1986 and Exhibit #3, Letter from Dr. William Speed dated November 9, 1994.[1]

---

[1] Both of these Exhibits were deemed admitted in to evidence by the Defendant.  See Exhibit #1, Response #13.

12) Plaintiff documented her condition with the Department of Labor as early as 1986 who accepted her migraine claim.  <u>See</u> Exhibit G, Records form the Department of Labor. See also Exhibit 1, Response #2.

13) Plaintiff has also sought continuous medical treatment for her migraine condition since 1986.  <u>See</u> Exhibit C at 77, 225-227. <u>See also</u> Exhibit #2; <u>See also</u> Exhibit #3.

14) Plaintiff suffers from her migraine condition on a regular basis, but when it is triggered, the symptoms include memory loss, loss of balance, loss of vision in the left eye, paralysis through the left side of Plaintiff's face, loss of hearing in the left ear,   inability to sleep, sensitivity to light, sound, and odors, incapacitating headaches, nausea, vomiting, cognitive difficulties in terms of concentrating; and at the time of severe incapacitating symptoms (which include severe pain), is unable to engage in any activity other than lying in bed in a dark room <u>See</u> Exhibit C, at 87-90,   <u>See also</u> Exhibit H, Affidavit of Maureen Moriarty-Sheehan, R.N., MS., CRNP; <u>See also</u> Exhibit I, February 2004 Deposition of Plaintiff at 4-5.

15) This condition has imposed limitations on Plaintiff's major life activities.  <u>See</u> Exhibit H.

16)  Whenever Plaintiff took leave, she would have a doctor's certificate attached to her leave slips, and also noted her Workman's Compensation number.  <u>See</u> Exhibit B, at 138.

17) Plaintiff suffered form migraines and the associated symptoms approximately 100 times in 1991 and 200 times in 1991.  See Exhibit E.  See also Exhibit #4, Speed Headache Charts Documenting Headache Occurrences. [2]

---

[2] These Exhibits were deemed admitted by Defendant, See Exhibit 1, Request #13.

18) Plaintiff regularly missed work and her leave became chronic over several years. <u>See</u> Exhibit J, Deposition of John Machado at 32-34.

19) Mr. Machado was provided with the doctor's certificates (and leave slips) which stated that Plaintiff was being treated for migraines, and he knew from the certifications that they were heat triggered. <u>See</u> Exhibit J, at 25-26; <u>See also</u> Exhibit B at 113.

20) Mr. Wallace Keefe, Chief of the Management and Organization Division, stated that he became aware of Plaintiff's condition when her supervisor, John Machado, brought to his attention that leave she had requested was due to migraine headaches, a previously existing condition.  <u>See</u> Exhibit K, Deposition of Wallace Keefe, at 10.

21) Mr. Charles Sleasman, Deputy Chief, also stated that "..we felt that she had a problem with heat-triggered migraines…"  <u>See</u> Exhibit L, Hearing transcript Vol. II at 285.


C.    <u>Building Conditions</u>

22) The building that Plaintiff worked in had poor ventilation, was hot, stuffy, and several normal (non-handicapped) employees complained about the conditions.  <u>See</u> Exhibit D, at 65; <u>See also</u> Exhibit M, Affidavit of Darnelle Sneed; <u>See also</u> Exhibit E; <u>See also</u> Exhibit K at 17,18, <u>See also</u> Exhibit J at 45-50.

23) Plaintiff herself complained about the heat and poor ventilation, and asked for an accommodation. <u>See</u> Exhibit D, at 74-76.

24) The Secret Service had full authority for the facility's responsibilities.  See Exhibit K, at 17.

25) On December 30, 1991, an indoor quality assessment was conducted by Biospheric Inc. for the Secret Service.  See Exhibit J at 57.  See also Exhibit N, Biospherics Incorporated Report of December 30, 1991.

26) The report noted that "The overall circulation was judged as fair to poor throughout both floors" where Plaintiff normally worked. Id.

27) The report also noted that the relative humidity was lower than the ASHRAE guidelines. Id.

28) A second Indoor Air Quality Survey was conducted on May 21, 1992. See Exhibit O, Biospherics Incorporated report of May 21, 1992.

29) The second survey once again noted that "The overall circulation throughout the building was generally judged as good in the exterior areas and fair to poor in the interior areas." Id.

30) The 1992 survey also stated 'in addition, the temperature was observed to vary from place to place; some areas were very warm.  Restricted air flows and poor ventilation were undoubtedly causative factors for this observation." Id.

31) About a year and a half after Plaintiff's complaints of excessive heat, Defendant placed fans in the area, but they were not effective and the complaints of heat continued.  See Exhibit D, at 80, See also Exhibit M.  See also See Exhibit I at 20, 25.

32) Plaintiff prepared a claim with the Department of Labor on March 27, 1991 based on "severe nose bleeds due to extreme dryness in the building air; extreme heat compounds extreme dryness."  See Exhibit P, Claim to U.S. Dept. of Labor.

33) Plaintiff suffered from migraines while at work and became visibly ill due to the pain she had.  <u>See</u> Exhibit C, at 138, 171-172; <u>See also</u> Exhibit Q, Affidavit of Agent Statham; <u>See also</u> Exhibit M; <u>See also</u> Exhibit F, at 24. <u>See also</u> Exhibit C, at 172.

34) When Plaintiff had migraine attacks, she would not immediately leave the office because she lived in Baltimore, traveled to and from work on the MARC train, and the train did not frequently depart to Baltimore.  <u>See</u> Exhibit E.

35) Plaintiff was never accommodated and eventually left the work area in October 1992.  <u>See</u> Exhibit D, at 79, 80.

<u>Work History and Appraisals</u>

36) On July 25, 1991, Plaintiff received her performance appraisal for the period ending June 30, 1991. <u>See</u> Exhibit R, Appraisal dated 7/24/91.

37) On this 1991 rating, Plaintiff received a numerical rating of 300 out of the possible 400.  Id.

38) Plaintiff received the rating because she was doing a good job in general and did an outstanding job on the Agency's correspondence manual, the only major project she was given.  <u>See</u> Exhibit B at 104.

39) Plaintiff was never given job elements prior to her appraisal.  Id. at 75.

40) On October 1, 1991, Plaintiff was told that her performance rating would be rescinded and that she would be given her job elements and standards.  Plaintiff was also told that she would be receiving a new evaluation 90 days after having received the elements.  Id., at 77.

41) Sometime after October 1991, Plaintiff was approached by a co-worker and congratulated for getting a promotion as a result of her grievance.  Id.

42) Plaintiff then contacted the Chief of Personnel and complained that her grievance was not being kept confidential.  Id., at 78.

43) On October 16, 1991, Plaintiff was called in to Mr. Keefe's office and Mr. Machado was present.  Id.

44) In that meeting, Mr. Keefe stated that he was ticked off that Plaintiff had gone over his head.  Plaintiff explained that she went to the chief of personnel because he and Mr. Machado were part of the problem.  Id.

45) Mr. Machado admitted raised his voice at Plaintiff on several occasions.  Id., at 108.

46) Mr. Keefe answered that he was concerned that Plaintiff did not want to work at the Secret Service, that she had a bad attitude, was not happy, was not doing what she was hired to do, and that she should look for another job because she lacked communication skills.  Id.

47) On January 14, 1992, Plaintiff's office experienced flooding problems.  Id., at 79.

48) Plaintiff and two other employees had left the building to get lunch and when they returned, they were told by a co-worker and a Special Officer that the building was closed.  Id.

49) When they entered the building, they were told by another Special Officer that the building was closed and that the employees were being sent home. Id.

50) Plaintiff and her co-workers then went upstairs, got their personal belongings, and went home.  Id.

51) On January 15, 1992, Mr. Machado called Plaintiff and the two female co-workers into his office and told them that they were being placed on AWOL.  Id., at 80.  <u>See also</u> Exhibit C at 182-185.

52) Assistant Director, Mr. David Lee had instructed Mr. Keefe and Mr. Machado not to place Plaintiff on AWOL.  <u>See</u> Exhibit L, at 298.

53) Later that day, Mr. Machado requested a written statement regarding the absence without authorization (AWOL). Plaintiff, after receiving guidance on the continuing situation with Machado from the Ombudsman, was told to provide Machado with the official USSS teletype which stated that the building had been officially closed. Id., at 80,81.

54) Mr. Machado "lost all faith in my ability to deal with Ann Mogenhan." <u>See</u> Exhibit B at 112.

55) On the morning of January 16, 1992, Mr. Machado approached Plaintiff in the lobby and told her to see him in his office immediately in an irritable and curt manner.  Id. <u>See also</u> Exhibit S, Hearing Transcript Vol. V at 83.

56) On January 16, 1992, Mr. Machado gave Plaintiff her new appraisal.  The new score was a 270, 30 points lower than it was 90 days prior.  <u>See</u> Exhibit B, at 16-18.

57) Plaintiff's appraisal was lowered in "communication" and in administration.  Id.

58) Plaintiff's rating was lowered because Mr. Machado did not assign her work that was of a caliber of the previous work she had done.  <u>See</u> Exhibit T, Hearing Transcript Vol. IV at 53-54.

59) After giving Plaintiff her new appraisal, Plaintiff asked for work commensurate with her grade level and Mr. Machado told Plaintiff that he would keep her busy to keep her from running her mouth. <u>See</u> Exhibit B, at 82, 110.

60) Mr. Machado then warned that he would take Plaintiff off of the compressed work schedule, and jumped out of his chair and banged on his desk when Plaintiff refused to discuss the AWOL incident again.  Id.

61) On January 16, 1992, Plaintiff contacted an EEOC counselor to file a complaint of discrimination.  <u>See</u> Exhibit E.

62) On January 21, 1992, Rena Blue (now Lane), Darnelle Sneed (the two co-workers charged with AWOL) and Plaintiff were called into Mr. Keefe's conference room and told that they would be charged with AWOL. See Exhibit B, at 83.

63) On January 22, 1992 Plaintiff filed EEO Charge No. 92-1112.  <u>See</u> Exhibit B at 2, <u>See also</u> Exhibit E.

64) On February 28, 1992, Plaintiff filed a formal complaint of discrimination EEO Charge No. 92-1238. Id., at 7.

65) On April 6, 1992, Mr. Machado threatened to charge Plaintiff with AWOL for leave that he had already approved.  <u>See</u> Exhibit E.

66) On April 7, 1992, Mr. Machado became volatile and physically confronted Plaintiff in front of Agent (Ombudsman) Doug James. Id.

67) On July 24, 1992, Plaintiff received yearly performance rating of 280 out of a possible 400. See Exhibit V, 1991-1992 Appraisals.

68) Plaintiff worked in the areas of Directives and Handbooks in the PARS office together with Claude King, Ann Parker, George Pomeroy, Rena Lane, and Darnelle Sneed. <u>See</u> Exhibit E.

69) All of these employees were non-disabled.

70) Of the similarly situated employees of plaintiff who were evaluated by Mr. Machado, the scores were the following:

1)   Claude (Tad) King-White Male- 375
2)   Rena Blue- Black Female - 275
3)   Darnelle Sneed- Black female- 175
4)   George Pomeroy- White Male-375
6)   Ann Parker-Black Female - 375

<u>See</u> Exhibit U.

71) The three employees who received lowest scores were all females; Plaintiff, Ms. Blue, and Ms. Sneed. Id.

72) Ms. Parker had worked with Mr. Machado at the National Archives and Records Administration for many years, prior to working at the Secret Service.  Id.

73) Plaintiff was an extremely good worker and her work was far better than many others in the branch.  <u>See</u> Exhibit M, <u>See also</u> Exhibit Q, <u>See also</u> Exhibit V, Affidavit of Ms. Blue (now Lane); <u>See also</u> Exhibit C, at 133, 171-172; <u>See also</u> Exhibit F, at 62, 116.

74) Plaintiff's work was also far superior than the work of Mr. Pomeroy and Mr., King. <u>See</u> Exhibit C, at 131.

75) Plaintiff deserved a rating of 400.  Id., at 133.

76) Plaintiff got along well with almost everyone in the office and those she was not friendly with were always treated professionally and respectfully.  <u>See</u> Exhibit M, <u>See also</u> Exhibit E.

77) Mr. Machado was also aware that the stress he caused Plaintiff contributed to her migraine condition.  <u>See</u> Exhibit L, at 27-28.

78) Plaintiff was never written-up, she never received any reprimand, and was never informed of any disciplinary action against her.[3]  <u>See</u> Exhibit E.


<u>Mr. Machado's Treatment of Plaintiff</u>

79) Mr. Machado treated women worse than men under his supervision.  <u>See</u> Exhibit C. at 187.

80) Mr. Machado would yell at women in the office.  <u>See</u> Exhibit C, at 176-180, 213. <u>See also</u> Exhibit F at 16.  <u>See also</u> Exhibit V.

81) Mr. Machado did not yell at male employees. <u>See</u> Exhibit C, at 180.  <u>See also</u> Exhibit I, at 45.

82) Mr. Machado treated female employees differently than male employees.   <u>See</u> Exhibit C, at 178, 180,186, 253.  <u>See also</u> Exhibit L, at 225; <u>See also</u> Exhibit F at16-17, 29-30.

83) Examples of disparate treatment between me and women included men getting less work than Plaintiff and then receiving higher appraisals and awards.  <u>See</u> Exhibit I, at 44.

84) Men were not charged with AWOL.  Id., at 45.

---

[3] The one write-up for the AWOL incident was removed and never became official.

85) Plaintiff, Ms. Blue, and Ms. Sneed were told by Mr. Machado that they had to report to either himself, Ms. Parker, of Mr. King before leaving the office. See Exhibit L, at 9.

86) Mr. Machado often screamed at Plaintiff.  Id, at 73, 76.  See also Exhibit B at 108.

87) Mr. Machado raised his voice higher than usual when he screamed at Plaintiff.  See Exhibit F, at 92, 128.

88) Mr. Machado had a hostile attitude towards Plaintiff.  See Exhibit M.

89) After Plaintiff was transferred, Mr. Machado continued harassing her. See Exhibit L at 24, lines 5-16; See also Exhibit E.

UNITED STATES DISTRICT COURT FOR
THE DISTRICT COURT OF COLUMBIA

| | | |
|---|---|---|
| ANN MARIE MOGENHAN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 98-CV- |
| | ) | 0817(RWR/DAR) |
| JOHN W. SNOW, SECRETARY, | ) | |
| U.S.  DEPT. OF TREASURY, | ) | |
| | ) | |
| Defendant. | ) | |

**...oOo...**

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

I.      **Claims of Plaintiff**

In Plaintiff's Amended Complaint, she made the following assertions:

1)  Defendant failed to grant her a reasonable accommodation for her disability;

2)   Defendant discriminated against her, based on her disability and gender, when they issued her a lowered performance appraisal for the rating period of October 1991-December 1991;

3)   She was discriminated against on the basis of her gender, disability and retaliation when she received a lowered performance appraisal in July 1992; and

4)   She was subject to a hostile work environment based on her gender, disability, and retaliation.

See Exhibit W, Amended Complaint Counts I, II, III, and IV.

## II.    **Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment when the pleadings, affidavits, depositions, answers to interrogatories, and admissions of record demonstrate that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). A disputed issue of material fact is genuine and therefore precludes summary judgment where the Court determines that a reasonable jury could conceivably find in favor of the non-moving party on that factual issue. Anderson, 477 U.S. at 248. However, even where a genuine issue exists as to some material fact, the movant is entitled to summary judgment against "a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the

burden of proof at trial." Celotex, 477 U.S. at 322.

As a general rule, when adjudicating a motion for summary judgment, the Court must "assume the truth of all statements proffered by the party opposing summary judgment" and construe all evidence in favor of the non-moving party. Greene v. Dalton, 334 U.S. App. D.C. 92, 164 F.3d 671, 675 (D.C. Cir. 1999). See Anderson, 477 U.S. at 255; Carter v. Greenspan, 304 F. Supp. 2d 13, 21 (D.D.C. 2004). Indeed, the Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000). See also Washington Post Co. v. United States Dep't of Health and Human Servs., 275 U.S. App. D.C. 101, 865 F.2d 320, 325 (D.C. Cir. 1989

In order to survive a motion for summary judgment, a plaintiff must at least present evidence upon which a reasonable jury could find that a prima facie case for liability has been established. See Taylor v. Small, 358 U.S. App. D.C. 439, 350 F.3d 1286, 1292 (D.C. Cir. 2003) (affirming district court's grant of summary judgment for plaintiff's failure to sufficiently make out prima facie case for discrimination and retaliation.)

Courts evaluating motions for summary judgment in discrimination cases are advised to proceed with additional caution and to apply a heightened degree of scrutiny. See Waterhouse v. Dist. of Columbia, 124 F. Supp. 2d 1, 4 (D.D.C. 2000), aff'd, 353 U.S. App. D.C. 205, 298 F.3d 989 (D.C. Cir. 2002); Calhoun v. Johnson, 1998 U.S. Dist.

LEXIS 22376, 1998 WL 164780, at 3 (D.D.C. 1998), aff'd. 1999 U.S. App. LEXIS 25165, 1999 WL 825425 (D.C. Cir. 1999). However, even under this heightened standard, a discrimination plaintiff "is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." Waterhouse, 124 F. Supp. 2d at 4 (quoting Calhoun, 1998 U.S. Dist. LEXIS 22376, 1998 WL 164870 at *3).


Local Civil Rule 7(h) provides that oppositions to motions for summary judgment "shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the part of the record relied on to support the statement."

In the case at bar, Plaintiff can demonstrate that a genuine issue exists regarding material facts.  Therefore, the Defendant's Motion for Summary Judgment should be denied.


## III.    Argument

### 1)  Elements for Disability Discrimination

The ADA bars a covered employer from "discriminating against a qualified individual with a disability because of the disability of such individual in regard to . . . employment." 42 U.S.C. § 12112(a). The ADA defines discrimination to include the failure to make "reasonable accommodations to the known physical or mental limitations

of an otherwise qualified individual with a disability**."** *Id.* § 12112(b)(5)(A). A

"disability**,**" in turn, is defined as "a physical or mental impairment that substantially

limits one or more major life activities of such individual." *Id.* § 12102(2)(A).


**A.**   Plaintiff is Disabled

Plaintiff is a qualified individual with a disability.  In Haynes v. Williams, 2004 U.S.

App. LEXIS 26276 (2004) the Supreme Court stated:

> "The ADA bars a covered employer from "discriminating against a qualified
> individual with a disability because of the disability of such individual in regard
> to . . . employment." 42 U.S.C. § 12112(a). The ADA defines discrimination to
> include the failure to make "reasonable accommodations to the known physical
> or mental limitations of an otherwise qualified individual with a disability**."** *Id.* §
> 12112(b)(5)(A). A "disability," in turn, is defined as "a physical or mental
> impairment that substantially limits one or more major life activities of such
> individual." *Id.* § 12102(2)(A). n2 Accordingly, a plaintiff is disabled under the
> ADA if: (1) he suffers from an impairment; (2) the impairment limits an activity
> that constitutes a major life activity under the Act; and (3) the limitation is
> substantial. *See Bragdon*, 524 U.S. at 630-31; *Bailey v. Georgia-Pacific Corp.*,
> 306 F.3d 1162, 1167 (1st Cir. 2002). It is the plaintiff's burden to prove that he is
> disabled. *See Swanks v. Washington Metro. Area Transit Auth.*, 336 U.S. App.
> D.C. 319, 179 F.3d 929, 934 (D.C. Cir. 1999); *see also Bailey*, 306 F.3d at
> 1167."

Id.,at 8.

Therefore, to meet the definition of "disabled" under the ADA, Plaintiff must prove that

she suffers from an impairment, she is limited in a major life activity, and the limitation is

substantial.   Defendant does not dispute that Plaintiff has the physical impairment of

heat-triggered migraines.   See Defendant's Motion for Summary Judgment,

Memorandum of Law, at 15.

**B.**    Plaintiff is Limited in her Major Life Activities

Plaintiff's migraines limit her in major life activities.  The record shows that Plaintiff suffers from the migraine condition on a regular basis, but when it is triggered, the symptoms include memory loss, loss of balance, loss of vision in the left eye, paralysis through the left side of the face, loss of hearing the left ear, inability to sleep, sensitivity to light, sound, and odors, incapacitating headaches, nausea, vomiting, cognitive difficulties in terms of concentrating; and at times of severe, incapacitating symptoms, including severe pain, she is unable to engage in any activity other than lying in bed in a dark room. See Exhibit C, at 87-90; See also Exhibit H; See also Exhibit I at 4-5. These conditions substantially limit Plaintiff's ability to  eat, hear, read, write, concentrate, ability to comprehend, remember, see, sleep, smell, stand, walk, talk, communicate, and anything to do with the use of her hands or fingers including washing, buttoning, zippering, brushing teeth, or personal grooming.  See Exhibit E.

In their brief, Defendant argues that when a major life activity is working, a plaintiff must establish she was restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person.  Defendant then asserts that because Plaintiff was able to produce high quality work and was able to work for the Baltimore Orioles on days she did not work for the Secret Service[4], "her claim of substantial impairment in a major life activity, i.e., her ability to work fails."

---

[4] After Plaintiff's deposition, Defendant indicted her on criminal charges, Criminal Action No. 96 cr 0084, for working for the Orioles on days she claimed to have migraines. The criminal charges were Dismissed With Prejudice on July 31, 1996.  See Exhibit X, Dismissal With Prejudice Order.

See Defendant's Motion for Summary Judgment, Memorandum of Law at 16.   This

argument fails for several reasons.[5]


In the case at bar, Plaintiff's limited major life activities are not exclusively work

related.  In fact, work is not the focus of her limitations.  In <u>Toyota Motor Manufacturing</u>

<u>v. Williams, 534 U.S. 184, 200-201 (2002)</u> the court stated:

> "While the Court of Appeals in this case addressed the different major life
> activity of performing manual tasks, its analysis circumvented *Sutton* by focusing
> on respondent's inability to perform manual tasks associated only with her job.
> This was error. *When addressing the major life activity of performing manual
> tasks, the central inquiry must be whether the claimant is unable to perform the
> variety of tasks central to most people's daily lives, not whether the claimant is
> unable to perform the tasks associated with her specific job*. Otherwise, *Sutton*'s
> restriction on claims of disability based on a substantial limitation in working
> will be rendered meaningless because an inability to perform a specific job
> always can be recast as an inability to perform a "class" of tasks associated with
> that specific job.
>
>   *There is also no support in the Act, our previous opinions, or the
> regulations for the Court of Appeals' idea that the question of whether an
> impairment constitutes a disability is to be answered only by analyzing the effect
> of the impairment in the workplace*. Indeed, the fact that the Act's definition of
> "disability" applies not only to Title I of the Act, <u>42 U.S.C. §§ 12111</u>-12117
> (1994 ed.), which deals with employment, but also to the other portions of the
> Act, which deal with subjects such as public transportation, §§ 12141-12150, <u>42
> U.S.C. §§ 12161</u>-12165 (1994 ed. and Supp. V), and privately provided public
> accommodations, §§ 12181-12189, *demonstrates that the definition is intended to
> cover individuals with disabling impairments regardless of whether the
> individuals have any connection to a workplace*." (Emphasis Added)


"Major life activities" are illustrated by the regulations as "functions, such as

caring for oneself, performing manual tasks, walking, seeing, hearing**,** speaking

breathing, learning, and working." <u>45  C.F.R.  §  84.3(j)(2)(ii)</u>; see also <u>29  C.F.R.  §</u>

<u>1630.2(i)</u>.  See also <u>Kalekiristos v. CTS Hotel Management Corp., 958 F. Supp. 641, 649</u>

<u>(D.D.C. 1997), aff'd 132 F.3d 1481 (D.C. Cir. 1997)</u>.   In the case at bar, Plaintiff suffers

---

[5] It is also important to note that Plaintiff specifically requested to work in outside employment for the
Orioles in 1990. Mr. Machado approved the request. <u>See</u> Exhibit Y, Outside Employment Request.

form memory loss, loss of balance, loss of vision in the left eye, paralysis through the left side of the face, loss of hearing the left ear, inability to sleep, sensitivity to light, sound, and odors, incapacitating headaches, nausea, vomiting, cognitive difficulties in terms of concentrating; and at times of severe incapacitating symptoms, including severe pain, she is unable to engage in any activity other than lying in bed in a dark room.  As these symptoms affect Plaintiff's ability to care for herself, walk, see, and hear, she has shown that she is impaired in her major life activities.


**C**.     Plaintiff is Substantially Limited in Her Major Life Activities

Plaintiff's disability is of a substantial nature.  "Substantially limits" is defined by regulation as: "(i) unable to perform a major life activity that the average person in the general population can perform or (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). In the case at bar, Plaintiff suffered from migraines and the accompanying symptoms approximately 200 times in 1991 and approximately 100 times in 1992.  See Exhibit #4; See also Exhibit E.   These occurrences were documented in charts that Plaintiff filled out on a regular basis and submitted to her doctors and nurses.  See Exhibit 4.  Because of her condition, Plaintiff also missed a large number of work days to the point that her supervisor termed her leave as chronic over a period of several years.  See Exhibit J, at 33-35.   Therefore, Plaintiff has also shown that her major life activities were of a substantial nature. As Plaintiff has shown that she was substantially limited in major life

activities, her disability and hostile work environment claims should not be dismissed, and Defendant's Motion for Summary Judgment should be denied.

> **D.**     The Agency Failed to Grant Plaintiff's Request for an Accommodation

To establish a prima facie case of discrimination under the Rehabilitation Act for failure to accommodate**,** a plaintiff must show "(1) that [she] was an individual with a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." Scarborough v. Natsios, 190 F. Supp. 2d 5, 19 (D.D.C. 2002) (quoting Rhoads v. FDIC, 257 F.3d 373, 387 n.11 (4th Cir. 2001)).

To request accommodation, an individual may use "plain English" and need not mention the ADA or use the phrase "reasonable accommodation. See Exhibit Z, EEOC Enforcement Guidance on Reasonable Accommodation and Undue Hardship. Under the Americans with Disabilities Act, No. 915.002, Question 1 (rev. Oct. 17, 2002).

Plaintiff has shown that she has a disability within the meaning of the statute, and the record shows her employer had notice of the disability.  Whenever Plaintiff took leave, she would have a doctor's certificate attached to her leave slips, and also noted her Workman's Compensation number.  See Exhibit B, at 138. Her supervisor, Mr. Machado was also provided with doctor's certificates stating that Plaintiff was being treated for migraines, and he knew from the certifications that they were heat triggered. See Exhibit J at 25-26; See also Exhibit B at 113.  Mr. Wallace Keefe, Chief of the Management and Organization Division, stated that he became aware of Plaintiff's condition when her

supervisor, John Machado, brought to his attention that leave she had requested was due to migraine headaches, a previously existing condition. See Exhibit K at 10. Mr. Charles Sleasman, Deputy Chief, also stated that "..we felt that she had a problem with heat-triggered migraines…" See Exhibit L, at 285. Plaintiff herself complained about the heat and poor ventilation, and asked for an accommodation. See Exhibit D, at 74-76. Therefore, it is clear that the Defendant was put on notice of her condition and that Plaintiff did request that a reasonable accommodation be made for her.

Defendant then argues that placing large fans and conducting two indoor air quality assessments was in fact an accommodation to Plaintiff. See Defendants Motion for Summary Judgment, Memorandum of Law at 19. While Plaintiff admits that large fans were brought into to try to cool off the area (and Defendant cites to her deposition in their argument), Plaintiff fails to cite the rest of Plaintiff's testimony in which she stated that it was about a year and a half after her complaints of excessive heat, that the Defendant placed fans in the area, but they were not effective and the complaints of heat continued. See Exhibit D, at 80, See also Exhibit M. See also Exhibit I at 20, 25. Because the fans were placed well after the accommodation was requested and were wholly ineffective, Defendant did not accommodate Plaintiff's disability.

Similarly, Defendant's argument, that conducting two indoor air quality assessments equaled an accommodation, is also flawed. The building that Plaintiff worked in had poor ventilation, was hot, stuffy, and many employees (including Plaintiff) complained about the conditions. See Exhibit D, at 65, 74-76; See also Exhibit M; See also Exhibit E at 25; See also Exhibit K, at 17, 18; See also Exhibit J at 45-50. On December 30, 1991, an indoor quality assessment was conducted by Biospheric Inc. for

the Secret Service.  <u>See</u> Exhibit N.  The report noted that "The overall circulation was judged as fair to poor throughout both floors" where Plaintiff normally worked. Id.  The report also noted that the relative humidity was lower than the ASHRAE guidelines. Id.  Five months later on May 21, 1992, a second Indoor Air Quality Survey was conducted.  <u>See</u> Exhibit O.  The second survey once again noted that "The overall circulation throughout the building was generally judged as good in the exterior areas and fair to poor in the interior areas." Id.  The 1992 survey also stated "in addition, the temperature was observed to vary from place to place; some areas were very warm.  Restricted air flows and poor ventilation were undoubtedly causative factors for this observation." Id.  Both reports clearly stated that there were poor circulation and the second survey stated that some areas were very warm.  Having two air assessment tests (which both showed that heat and circulation were a problem) does not show that anything was done to accommodate the Plaintiff.  If anything, it shows that the Defendant was aware of the heat problems and failed to take any action to correct it.  Therefore, Defendant failed to act Plaintiff's on Plaintiff's request for accommodation, and Summary Judgment should not be granted to the Defendant.

**2)**      **<u>Gender Discrimination</u>**

A plaintiff has the burden of establishing a prima facie case of discrimination or retaliation by a preponderance of the evidence. <u>McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)</u>; <u>Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)</u>. To establish a prima facie case of discrimination, a plaintiff must demonstrate that (1) she is a member

of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. <u>Stella v. Mineta, 350 U.S. App. D.C. 300, 284 F.3d 135, 145 (D.C. Cir. 2002)</u>; <u>Brown v. Brody, 339 U.S. App. D.C. 233, 199 F.3d 446, 452 (D.C. Cir. 1999)</u>.

In the case at bar, Plaintiff is a member of a protected class as she is a female. Plaintiff suffered adverse employment actions when she was given lower performance appraisals in December 1991 (a 270 out of 400) and in July 1992 (a 280 out of 400). <u>See</u> Exhibit W. Defendant argues that there are no similarly situated employees outside her class that were given preferential treatment. <u>See</u> Defendant's Motion for Summary Judgment, Memorandum of Law at 20.

A review of the record shows that Plaintiff worked in the areas of Directives and Handbooks, and organizational charts as a GS-343-9/11 Management Analyst in the PARS office. Other PARS individuals who also worked on Directives and organizational charts were: Claude (Tad) King (WM), Ann Parker (BF), George Pomeroy (WM), Rena Lane (nee Blue) (BF), and Darnelle Sneed (BF). <u>See</u> Exhibit E. Therefore, there are similarly situated employees that Plaintiff can be compared to.

When comparing the July 1992 performance ratings of Plaintiff and her comparators, it becomes evident that Plaintiff and the other females received far lower scores than the males. Out of a possible score of 400, Plaintiff received a 280, Rena Blue received a 275, Darnelle Sneed received a 175, Tad King received a 375, George Pomeroy received a 375, and Ann Parker received a 375. <u>See</u> Exhibit U. The three employees who received lowest scores were Plaintiff, Ms. Blue, and Ms. Sneed. It is also very important to note that Ms. Parker had worked with Mr. Machado at the National

Archives and Records Administration for many years, prior to working at the Secret Service and enjoyed a different relationship with him.  <u>See</u> Exhibit E.

The record also shows that Plaintiff was an extremely good worker and her work was far better than many others in the branch.  <u>See</u> Exhibit M; <u>See also</u> Exhibit Q; <u>See also</u> Exhibit V; <u>See also</u> Exhibit C, at 133, 171-172; <u>See also</u> Exhibit F, at 62, 116.  Specifically, Plaintiff's work was far superior than the work of Mr. Pomeroy and Mr., King.  <u>See</u> Exhibit C, at 131.  Yet despite her high level of work and the amount of work she accomplished, she received far lower ratings (and no awards) than her male comparators.

The record also shows that Mr. Machado treated women worse than men under his supervision.  <u>See</u> Exhibit C. at 187. Mr. Machado would also yell at women in the office.  <u>See</u> Exhibit C, at 176-180, 213. <u>See also</u> Exhibit F at 16.  <u>See also</u> Exhibit V. Mr. Machado did not yell at male employees. <u>See</u> Exhibit C, at 180, <u>See also</u> Exhibit I, at 45.  Mr. Machado also treated female employees differently than male employees.  <u>See</u> Exhibit C, at 178, 180,186, 253; <u>See also</u> Exhibit L, at 225; <u>See also</u> Exhibit F at16-17, 29-30.   Therefore, there is a clear record that similarly situated employees of a different gender were treated more favorably than the Plaintiff.  Based on the testimony in the record, there is also evidence giving rise to an inference of discrimination.  Therefore, Plaintiff has established a prima facie case of discrimination and Defendant's Motion for Summary Judgment should be denied.

**3)**      <u>**Disability Discrimination**</u>

       To establish a prima facie case of discrimination, a plaintiff must demonstrate that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. <u>Stella v. Mineta, 350 U.S. App. D.C. 300, 284 F.3d 135, 145 (D.C. Cir. 2002)</u>; <u>Brown v. Brody, 339 U.S. App. D.C. 233, 199 F.3d 446, 452 (D.C. Cir. 1999)</u>.

       In the case at bar, Plaintiff is a member of a protected class as she is disabled. Plaintiff suffered adverse employment actions when she was given lower performance appraisals in December 1991 (a 270 out of 400) and in July 1992 (a 280 out of 400).  <u>See</u> Exhibit W.  Defendant argues that there are no similarly situated employees outside her class that were given preferential treatment.  <u>See</u> Defendant's Motion for Summary Judgment, Memorandum of Law at 20. However, as discussed above, non-disabled employees received higher performance appraisals than Plaintiff.  Similarly, non-disabled employees were not charged with AWOL, screamed at by Mr. Machado, and subject to a hostile work environment.  Therefore, Plaintiff has shown that she was discriminated against based on her disability.

**4)**      <u>**Defendant Retaliated against Plaintiff**</u>

       Defendant retaliated against Plaintiff based on her prior EEO activity, gender and disability. For a retaliation claim, the plaintiff must show that "(1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3)

there is a causal connection between the two." _Taylor v. Small_, 358 U.S. App. D.C. 439, 350 F.3d 1286, 1292 (D.C. Cir. 2003).

Plaintiff engaged in statutorily protected activity when she first met with an EEO counselor in January 1992.  See Exhibit B, at 19.  Plaintiff also filed a formal charge of discrimination in February 1992.  Id., at 8.  Defendant argues that because the alleged adverse employment actions took place before she participated in the EEO process, she cannot make out a prima facie case of retaliation.  See Defendant's Motion for Summary Judgment Memorandum of Law at 22.  However, the Amended Complaint, as well as a basic review of the record, clearly cite to numerous instances of retaliation which occurred after the statutorily protected activity.   Examples include:

- On April 6, 1992, Mr. Machado verbally threatened Plaintiff on the telephone with an AWOL charge for leave that he had already approved. See Exhibit E;

- On April 7, 1992 Mr. Machado become volatile and physically confronted Plaintiff in the presence of Agent (Ombudsman) Doug James. See Exhibit E

- On July 20, 1992, Plaintiff received another lowered appraisal from Mr. Machado and received no cash award.  See Exhibit B at 58. See also Exhibit E;

- On August 27,1992, Mr. Machado, Mr. Keefe and Mr. Sleasman continued to make derogatory remarks about Plaintiff to others in agency including co-workers; See Exhibit E, and

- On September 10, 1992, Mr. Machado increased Plaintiff's workload (5-6 times greater than other employees) and indicated he was doing so "to keep me (Plaintiff) too busy to file complaints." See Exhibit E.

Therefore, Plaintiff can make out a prima facie case of retaliation as the Defendant retaliated against Plaintiff after she had engaged in statutorily protected activity.  As such, Defendant's Motion for Summary Judgment should be denied.

**5.     Defendant Failed to Articulate Legitimate Nondiscriminatory Reasons
         for their Actions**

1.     January 1992 Rating

Defendant's stated legitimate nondiscriminatory reasons are pretextual in nature. Under the burden-shifting framework of _McDonnell Douglas Corp. v. Green,_ 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), once the employer has articulated legitimate, non-discriminatory reasons for the challenged employment action, a plaintiff -- to survive summary judgment -- must present evidence sufficient to create a material issue of fact as to whether the employer's proffered justification is a pretext for discrimination. _See Aka v. Washington Hospital Ctr.,_ 332 U.S. App. D.C. 256, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).  The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." _St. Mary's Honor Center_ v. _Hicks,_ 509 U.S. 502, 511 (1993).

On July 25, 1991, Plaintiff received her performance appraisal for the period ending June 30, 1991. See Exhibit S.  Plaintiff received a numerical rating of 300 out of the possible 400.  Id.  On January 16, 1992, Mr. Machado gave Plaintiff her new appraisal.  The new score was a 270, 30 points lower than it was 90 days prior. See Exhibit B at 16-18.    Plaintiff's appraisal was lowered in Communication and in Administration.  Id.

Defendant argues that Plaintiff's rating was lowered in the area of Administration because Plaintiff had been promoted to the GS-11 level and Mr. Machado expected a higher level of work.  See Defendant's Motion for Summary Judgment Memorandum of Law at 23.    Defendant then argues that there was a lack of available work to give Plaintiff which could have lead to a higher rating.  Id.

As for the area of Administration, Defendant does not contend that Plaintiff failed to produce the same work product as she had in the past 90 days.  Rather, Mr. Machado lowered her rating because Plaintiff was promoted to a GS-11, and because he did not have challenging work for Plaintiff.  This argument fails for several reasons.  First of all, Plaintiff can only be measured by the work that she is given.  It was the Defendant who failed to give her more challenging and grade appropriate work.  Plaintiff successfully completed every task given to her, and it is simply unfair for Defendant to lower her rating because of their own inaction.

What is more telling is the explanation given for Plaintiff's lowered rating in communication.  Defendant argues that her score was lowered because she did not get along with others.  Defendant asserts that in the 90 day review period, her behavior warranted a lowering of her rating.  In Mr. Machado's affidavit, he cites to Plaintiff's relationship with Mr. King as the primary reason for her lowered rating.  See Exhibit B at 110-111.  However, Mr. Machado admitted at his deposition that Plaintiff having filed a grievance against him was a good part of the reason to lower her rating.  Mr. Machado could also not recall a single incident in the 90 day period in which Plaintiff had a communication problem with other employees.  See Exhibit T, at 55-56.  Therefore, the proffered reasons given by the Defendant for Plaintiff's lowered January 1992 ratings are

pretextual in nature and were in fact discriminatory in nature.   As such, Defendant's Summary Judgment Motion should be denied.


2.      Plaintiff's July 1992 rating

Defendant's alleged nondiscriminatory reasons for Plaintiff's July 1992 rating are also pretextual in nature.   Defendant argues that Plaintiff received a 1 in the areas of personal relationships (which Mr. Machado considered generous) because of complaints about Plaintiff's ability to get along with others in the Secret Service.   Defendant also argues that Plaintiff was expected to do higher quality work at her level.

As discussed above, the record is clear that Plaintiff's work product was at least as good as anyone who worked under Mr. Machado.   In fact, the record shows that Plaintiff's work product was far better and more voluminous than other employees (even those at GS-12/13 levels) who received far higher ratings than she did.   See Exhibit M, See also Exhibit Q, See also Exhibit V; See also Exhibit C, at 131, 133, 171-172; See also Exhibit F, at 62, 116.

As for the ability to get along with others, the testimony of both Plaintiff and other employees is that she worked on a professional level with all of her co-workers. See Exhibit M, See also Exhibit E.   Despite the "complaints of others" that Mr. Machado referred to, Plaintiff was never written-up, she never received any reprimand, and was never informed of any disciplinary action against her.[6]   See Exhibit E.  In fact, Plaintiff asked for specific details regarding the situations that she had been accused of poor communication and was never given any further feedback.  Id. Therefore, Defendant cannot proffer any legitimate non-discriminatory reasons for their actions.  Because there

---

[6] The one write-up for the AWOL incident was removed and never became official.

are material facts which are disputed, Defendant's Motion for Summary Judgment should be denied.

**6.     Hostile Work Environment**

Plaintiff was subject to a hostile work environment based on her gender, disability, and retaliation.  Not all abusive behavior, even when it is motivated by discriminatory animus, is actionable. Rather, a workplace environment becomes "hostile" for the purposes of Title VII only when offensive conduct "permeates [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, (1998).

Whether the harassment in a particular case can be considered "severe or pervasive" is manifestly a mixed question of law and fact; in order to answer it, one aligns the established historical facts along side the legal rule, and determines whether the facts satisfy the statutory standard. *See Pullman-Standard*, 456 U.S. at 289 n.19; *see also Jordan v. Clark*, 847 F.2d 1368, 1375 n.7 (9th Cir. 1988).  In assessing whether a hostile work environment claim is viable, a court must "look to all the circumstances,' including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. See *Faragher v. Boca Raton*, 524 U.S. 775.

To establish a prima facie hostile work environment claim, Plaintiff must demonstrate that: (1) she is a member of a protected class; (2) he was subject to

unwelcome harassment; (3) the harassment occurred because of his gender; (4) the harassment affected a term, condition or privilege of employment; and (5) the employer knew or should have known of the harassment, but failed to take any action to prevent it. See Jones v. Billington, 12 F. Supp. 2d 1, 11 (D.D.C. 1997), aff'd, 1998 U.S. App. LEXIS 15459, 1998 WL 389101 (D.C. Cir. June 30, 1998).

In the case at bar, Plaintiff is a member of a protected class (disabled and/or female) and was subject to unwelcome harassment.   A review of the record shows the following actions and harassment that Plaintiff was subject to:

a) Prior to her employment, Plaintiff's first line supervisor, John Machado, circulated her job application to other employees stating that these were the credentials he was looking for in employees.  See Exhibit E.

b) Plaintiff complained about the heat and poor ventilation, and asked for an accommodation, but she did not receive the accommodation. See Exhibit M; See also Exhibit D, at 74-76.

c) On the morning of January 16, 1992, Mr. Machado approached Plaintiff in the lobby and told her to see him in his office immediately in an irritable and curt manner.  Id. See also Exhibit S at 83.

d) On January 16, 1992, Mr. Machado gave Plaintiff her new appraisal.  The new score was a 270, 30 points lower than it was 90 days prior.  See Exhibit B at 16-18.

e) Mr. Machado then warned that he would take Plaintiff off of the compressed work schedule, and jumped out of his chair and banged on his desk when Plaintiff refused to discuss the AWOL incident again.  Id.

f)  On April 6, 1992, Mr. Machado threatened to charge Plaintiff with AWOL for leave that he had already approved.  See Exhibit E.

g)  On April 7, 1992, Mr. Machado became volatile and physically confronted Plaintiff in front of Agent (Ombudsman) Doug James. Id.

h)  On July 24, 1992, Plaintiff received yearly performance rating of 280 out of a possible 400. See Exhibit U

i)  Mr. Machado was also aware that the stress he caused Plaintiff contributed to her migraine condition.  See Exhibit L, at 27-28.

j)  Men got less work than Plaintiff and then received higher appraisals and awards.  See Exhibit I at 44.

k)  Men were not charged with AWOL.  Id., at 45.

l)  Plaintiff, was told by Mr. Machado that they had to report to either himself, Ms. Parker, of Mr. King before leaving the office. See Exhibit L at 9.

m) Mr. Machado often screamed at Plaintiff.  Id, at 73, 76.  See also Exhibit B at 108.

n)  Mr. Machado verbally berated Plaintiff and made snide remarks about her. He would also not let her ask questions at meetings  . See Exhibit C at 240.

o)  Mr. Machado raised his voice higher than usual when he screamed at Plaintiff. See Exhibit F, at 92, 128.

p)  On August 27,1992; Machado, Keefe and Sleasman made derogatory remarks about Plaintiff to others in agency including co-workers. In a meeting with Rena Lane, Mr. Machado told Plaintiff, " You're not civil," "you're difficult to work with;"  Mr. Machado then indicated that he "will be watching me"

and required Plaintiff to report to one of three individuals whenever she left her cubicle even to go to the bathroom. See Exhibit E.

q)  Mr. Machado sent details of Plaintiff's complaint through the LAN so anyone using the LAN had knowledge of the complaint. Id.

r)  On September 10, 1992 Mr. Machado increased Plaintiff's workload (5-6 times greater than other employees) and indicates he was doing so "to keep me too busy to file complaints." Id.

s)  On October 19, 1992 Machado burst into Plaintiff's office door looking for Rena Lane.  Id.

t)  On October 28, 1992 Mr. Machado again bursts into Plaintiff's office again looking for Rena.  Id.

u)  On January 23, 1994 and continuing; USSS continued to harass Plaintiff with an ongoing criminal investigative file.  Id.

v)  In June 1994 Secret Service officials contacted Social Security Administration to open up Plaintiff's personnel records, falsely stating they were doing a background investigation on Plaintiff for employment.  Plaintiff had left the USSS more than 5 months prior to this request which was made under false pretenses.  September 1994; Secret Service officials contact the Baltimore Orioles to secure part-time employment records; Orioles refuse to provide records without a subpoena. Id.

These numerous harassing incidents, witnessed in part by numerous co-workers, permeated Plaintiff's workplace with discriminatory intimidation, ridicule, and insult that were sufficiently severe and pervasive to alter the conditions of her employment thereby

creating an abusive working environment.   Accordingly,   Defendant's   Motion   for Summary Judgment on Plaintiff's claim for discriminatory and retaliatory hostile work environment should be denied.


**IV.**   <u>Conclusion</u>

For the forestated reasons, there are genuine issues of material fact.   Therefore, Plaintiff respectfully requests that Defendant's Motion for Summary Judgment be denied

Respectfully submitted on this   _10th___day of January, 2005.


_____/s_____
Morris E. Fischer, Esq. (MD: Bar No. 26286)
Ari Taragin, Esq. (MD: Bar No. 27409)
Snider & Fischer, LLC
104 Church Lane, Suite 201
Baltimore, Maryland 21209
410-653-9060 phone
410-653-9061 fax

UNITED STATES DISTRICT COURT FOR
THE DISTRICT COURT OF COLUMBIA

ANN MARIE MOGENHAN            )
                             )
            Plaintiff,        )
                             )
    v.                        )
                             )    Case No. 98-CV-
                             )    0817(RWR/DAR)
JOHN W. SNOW, SECRETARY,      )
U.S.  DEPT. OF TREASURY,      )
                             )
            Defendant.        )

**...oOo...**

## ORDER

Upon consideration of the Agency's Motion for Summary Judgment and the

Complainant's Opposition to Defendant's Motion for Summary Judgment Motion, it is

on this _____ day of_____, 2004,

ORDERED: that Defendant's Motion for Summary Judgment is DENIED.


_____

UNITED STATES DISTRICT JUDGE


Cc:

Morris E.  Fischer, Esq.
104 Church Lane, Suite 201
Baltimore, MD 21208

Charlotte A. Abel
Asst. United States Attorney
555 4th Street, N.W., 10th Floor
Washington, DC 20530