Statement of Basis and Issue in Complaint

92-1238  Whether the Complainant was discriminated against
because of her handicap (Physical - Heat Triggered
Migraines) and retaliated against because of prior
involvement in the EEO process (filed previous
complaint TD No. 92-1115) when on July 20, 1992,
Complainant received a rating of 280 on her
Employee Performance Planning and Appraisal Form,
SSF 3054 for the period of July 1, 1991 to
June 30, 1992; when allegedly Complainant was
subjected to character assassination and
harassment when management verbalized derogatory
statements to individuals inside and outside the
immediate office that Complainant was hard to
work with; that management gave her an excessive
amount of work; that management passed confidential
information from Complainant's personnel files
regarding her grievance and complaint; that

management remarked several times that she was
"not civil"; that management threatened to remove
Complainant from the compressed work schedule;
that management required her to report to one of
three individuals before leaving the office at all
times; that management informed Complainant that
management would be watching her; that she received
her latest performance appraisal containing
derogatory comments as a result of character
assassination.

Remedies Requested:

92-1238  That Branch Chief John Machado be removed from
management in the Secret Service; that Complainant
be given a reassignment outside of the Office of
Administration; that the management hierarchy be
changed within the Management and Organization
Division; that managers involved receive EEO
training;  that the most recent evaluation of 280
be raised to 300 or above with a cash award; and
that a derogatory statement on the evaluation be
removed from the file

B.  DESCRIPTION OF INVESTIGATION

1.  Identity of Investigator

Gayle E. Moore
Special Agent
Office of Gov't Liaison and Public Affairs
United States Secret Service
1800 G Street N.W., Room 805
Washington, D.C.  20223

2.  Date Case Received by Investigator

November 24, 1992

3.  Date Report of Investigation (ROI) Submitted to the
Regional Complaints Center

February 8, 1993

4.  Date ROI Accepted

February 12, 1993

5.  Place of Investigation

Washington, D.C.

6.  Dates of Investigation

December 29, 1992 to February 8, 1993

# INDIVIDUAL COMPLAINT OF EMPLOYMENT DISCRIMINATION

**Based on**

**Race, Color, Religion, Sex, National Origin, Age, Physical or Mental Handicap, or Retaliation**

| PLEASE TYPE OR PRINT | FOR OFFICE USE ONLY<br>COMPLAINT NO. |
|---|---|

**PLEASE NOTE: INFORMAL PRE-COMPLAINT EEO COUNSELING IS A REQUIREMENT AND NO FORMAL COMPLAINT CAN BE ACCEPTED FOR INVESTIGATION WITHOUT IT.**

1.
Ann Mogenhan
**Complainant's Name**
3040 St. Paul St.
**Home Address—Street, RD, P.O. Box**
Baltimore, Maryland 21218-3942
City          State          Zip Code
Home Phone: Area Code ( 410 ) 235-2542
Work Phone: Area Code ( 202 ) 435-7023
FTS
Give area code and number where you can be reached during normal business hours if different from those above.

2. Designation of Representative. If you want someone other than yourself to represent you, you must sign and submit TD 62-03.2, "Designation of Representative and Limited Power of Attorney." (or a suitable alternative), with this Individual Complaint of Discrimination to the Regional Complaints Center processing your case.

If, after submitting this Individual Complaint of Employment Discrimination, you decide to select a Representative, you must IMMEDIATELY SIGN AND SUBMIT TD F 62-03.2. If having selected a Representative and having submitted this form you WISH TO CHANGE your Representative, you must sign and submit a new TD F 62-03.2 naming your choice.

3. Are you now working for the Dept. of the Treasury? Yes ☑ No ☐
Did you formerly work for the Dept. of Treasury? Yes ☐ No ☑
If yes, when? _____
Have you applied for employment with the Dept. of Treasury?
Yes ☐ No ☑ Management Analyst, GS-343,
If you responded Yes to either of the first two questions, give title, series, grade and organization unit Secret Service

4. In what organization, office or unit of the Department do you believe discrimination/retaliation against you occurred?
Secret Service
Office of Administration
Management & Organization Division
Policy Analysis Records Service Branch

5. What was the date of the last alleged discriminatory/retaliatory event or incident covered in counseling?
1/20/92 Other events have occured that I regard as retaliatory since.

6. If you became aware of the alleged discriminatory/retaliatory event or incident covered in counseling on a date substantially different from that shown in 5, show date and explain.
N/A          N/A

7. What was the date of your last interview with the EEO counselor? State name of counselor, where located, and telephone number.
February 25, 1992
Isaiah Camp, Jr.
1800 G St., N.W. 20223
Liaison Division
202-435-9190

8. On this same matter have you filed a grievance under a negotiated grievance procedure? Yes ☐ No ☑
Under the Agency grievance system? Yes ☐ No ☑
Have you appealed to MSPB? Yes ☐ No ☑
State where and when filed or appealed, give identifying numbers and describe present status. N/A

9. Check *only* the basis or bases on which you think you were discriminated against. Put information in the space provided *only* for the category or categories in which you are alleging discrimination. If alleging age discrimination, give date of birth. (To file a complaint based on age, you must have been at least 40 years old when the matter of concern occurred.)

☐ AGE                 ☐ COLOR: _____         ☐ SEX _____         ☐ NATIONAL ORIGIN

DATE OF BIRTH _____
        M/D/Y                                                                                          _____

☐ RACE _____     ☐ RELIGION _____     ☑ RETALIATION/REPRISAL     HANDICAP:
                                                  FOR INVOLVEMENT IN
                                                  COMPLAINTS PROCESS         ☐ MENTAL
                                                                              ☑ PHYSICAL

TD F 62-03.5 (09-87)

92- 1115

7

capped, you should include a statement ... a manner in which you feel you were disc... ed against, e.g. failure to modify work site, failure to offer opportunity in ... dvancement. If you are handicapped an ... complaint is com... ned with a specific job, training, etc., you should c... denc... at you were qualified for the position, train... ic. which you ... . If handicapped, you should also request the reas... able accommodation you prefer, if appropriate. If you feel this space is n... uate to provide sufficient information to understand your complaint, you may use an extra sheet. If your complaint is accepted ... processing, you will be given the opportunity to provide a detailed affidavit.

On 1/22/92, I received a response to an administrative greivance indicating that my prior performance appraisal would be rescinded and that I would be rated again in ninety (90) days. Other employees in my immediate area were in the same circumstances that I was. However, their appraisals were not set aside. Nor were their performance awards removed.

I filed the grievance on 8/9/91 and shortly thereafter, my Branch and Division managers began harassing me. I am undergoing therapy for migraines and thus am considered to be under a handicapping condition. I am also covered by the Workers' Compensation Laws regarding this handicap.

On 10/21/91, I formally notified (in writing) my Assistant Director of the retaliation and harassment, specifically verbal abuse.

On 10/16/91, I was told by my Division Chief to find myself another job. He said that he has problems with me going over his head to get action on a complaint.

On 10/1/91, I was meeting with my Branch manager to discuss new performance appraisal job elements. During this meeting, my Branch manager, I was subjected to verbal abuse until I informed my manager that I would not stay and be subjected to his tirades.

On January 15, 1992, January 16, 1992, January 21, 1992, January 24, 1992 I was verbally harrassed by my Branch manager and both Division Chiefs. I was being threatened with an AWOL charge for an excused absence.

Sometime around the first week of February 1992, I was again harassed by my Branch manager. I have subsequently requested that my managers being put on notice for their retaliation tactics. This notification was done 2/27/92.

I am of the impression that management thinks that the harassment will trigger migraines, thus requiring me to miss work, at which time they would begin processing an action to dismiss me for too much lost time. I do not believe the harassment will terminate due to the notification.

When I received my new appraisal after the ninety day waiting period, my rating score was lowered and thus I did not receive any award. This is even though my work did not decrease or lack in quality from just the previous appraisal. I believe the reduced score was to send a message to myself and others.

11. State the remedial or corrective action you are seeking to resolve your complaint.

I want my current appraisal score raised in the areas I addressed in my original grievance and I request to receive the back award for the original rating and another award for the current rating. I also want the harassment to terminate by requring all three managers to attend formal EEO training.

12. You must sign and date this complaint.

_Signature_                                    2/28/92
                                               Date

TD F 62-03.5 (09-87)

92-1115                          8



# UNITED STATES SECRET SERVICE
# Employee Performance
# Planning & Appraisal Form

| NAME OF EMPLOYEE | SOCIAL SECURITY NUMBER* |
|---|---|
| Mogenhan, Ann M. | 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 |
| **POSITION TITLE** | **SERIES & GRADE** |
| Management Analyst | GS-0343-911 |

| LOCATION OF EMPLOYEE (OFFICE, DIVISION, BRANCH) | | | |
|---|---|---|---|
| Office of Administration Management and OrganizationDiv. Policy Analysis and Records Systems Branch | **SUPV** ☐ | **NONSUPV** ☒ | **PMRS** ☐ |
| | **RATING PERIOD FROM** 10/1/91 to 12/31/91 | | |

## BEGINNING OF RATING PERIOD

The Rating Official is responsible for ensuring that the SSF 3054A containing the employee's job elements and standards is completed per specific instructions outlined in the Administrative Manual, under the Secret Service Appraisal System.

Name and Title of Rating Official: _John MACHROL    Chief, PARS_

Signature & Date: _John Machrol    10/1/91_

Name and Title of Reviewing Official: _Jim Sleasman    Deputy Chief_

Signature & Date: _Cll Slee    10/1/91_

I acknowledge that the job elements for my position have been discussed with me.

Employee's Signature & Date: _Ann Marie Mogenhan    10/1/91_

## MID-YEAR REVIEW

Name and Title of Rating Official: _____

Signature & Date: _____

Employee's Signature & Date: _____

## END OF RATING PERIOD

I have appraised the employee's performance and documented the appraisal on this form.

Name and Title of Rating Official: _John MACHROL    Chief, PARS_

Signature & Date: _John Machrol    1/8/92_

Name and Title of Reviewing Official: _WM. R. KEEFE, JR.  Chief - MNO_

Signature & Date: _Wm Keefe    01/14/92_

I have been notified of my final numerical rating/level and I have retained a copy of the final rating.

Employee's Signature & Date: _Employee refused sign    1/16/92_

* Disclosure of your Social Security Number is voluntary. The information is used to identify and separate individuals with similar or identical names or initials. Refusal to disclose your Social Security Number will not be cause for denial of any right, benefit or privilege by law.

### Composite Performance Rating Form

**Responsibility of the Rating Officials.** Rating officials are encouraged to discuss the employee's performance in relation to performance standards at any time during the appraisal period. However, ratings completed by rating officials may not be communicated to employees **prior** to review and certification by the reviewing official. This does not preclude general communication about appraisal of performance between a supervisor and an employee. For example, the rating official may ask the employee to prepare a self-appraisal to initiate the evaluation process. A face-to-face discussion should take place if at all possible. If not possible, a discussion via telephone is encouraged.

After such discussions, the rating official is to complete SSF 3054, Composite Performance Rating Form, as outlined in the Administrative Manual. The rating official is to sign and date the form in the appropriate space and forward it to the reviewing official for approval. If the employee prepared a self-appraisal, this should be furnished to the reviewing official at the same time.

**Responsibility of the Reviewing Official.** The reviewing official shall carefully consider all of the information available and if he or she concurs with the tentative ratings made by the rating official, the rating form will be signed and dated in the appropriate space and returned to the employee through the rating official.

If the reviewing official disagrees with the tentative rating assigned to any of the individual elements, he/she is to strike through in Column E the rating to be changed, change accordingly the numerical element rating in Column G and describe briefly the reasons for changing the rating in Column I. The final numerical score is obtained (1) retotalling Column G and (2) listing that sum in Block J. Block K is to be completed for all PMRS employees. The rating form signed and dated in the appropriate space by the reviewing official is final and is to be returned to the employee through the rating official.

L. List names and titles of all Supervisors contributing to the rating official's evaluation of this employee. (If applicable). Space is provided immediately below for comments.

**COMMENTS**

The elements of Communication and Interpersonal Relations, performed by Ms. Hogenhaw during this rating period in a fully successful manner, should be considered as near term, reachable objectives of improvement which will bring her into the category of exceeding fully successful.

Attachment C   (cont.)

## Composite Performance Rating Form

| NAME OF EMPLOYEE | | | | | SOCIAL SECURITY NUMBER* | | | |
|---|---|---|---|---|---|---|---|---|
| Mogenhan, Ann M. | | | | | 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 | | | |

| A. ELEMENT | B. CRITICAL NONCRIT- CAL (C or N) | C. JOB ELEMENT (in brief) | D. | ELEMENT RATING JUSTIFICATION (Additional space provided on page four) | E. NUM ELE RAT | F. IMPOR WGT | G. E x F |
|---|---|---|---|---|---|---|---|
| 1 | C | Administration | | | 3 | 20 | 60 |
| 2 | C | Communication | | | 2 | 20 | 40 |
| 3 | C | Studies/Assign-ments/Projects | | | 3 | 25 | 75 |
| 4 | N | Interpersonal Relations | | | 2 | 10 | 20 |
| 5 | C | Program Main-tenance | | | 3 | 25 | 75 |
| | | | | | | 100 | 2. |

| I. REVIEWING OFFICIAL ADJUSTMENTS (Space provided on page four) | J. FINAL NUMERICAL RATING | K. LEVEL (FOR PMRS PURPOSES |
|---|---|---|
| NONE | 270 | N/A |

### M. FINAL NUMERICAL RATING (TO BE COMPLETED BY REVIEWING OFFICIAL)

Check the appropriate block which includes the final numerical rating.

☐ 0-99 Unacceptable (Level One)
(Or unacceptable rating in any critical element)

☒ 200-299 Fully Successful (Level Three)

☐ 100-199 Minimally Successful (Level Two)

☐ 300-360 Exceeds Fully Successful (Level Four)

☐ 361-400 Outstanding (Level Five)

### Performance Award Recommendation

Performance award recommendations are to be well documented utilizing space provided for Column D on pages 3 and 4

☐ Performance Award

☐ Quality Step Increase (eligible GS employees only)

$ _____ Award Amount (to be completed
by Award Pool Manager)

_____ Current grade and step

_____ Date of last within-grade increase

* Disclosure of your Social Security Number is voluntary. The information is used to identify and separate individuals with similar or identical names or initials. Refusal to disclose your Social Security Number will not be cause for denial of any right, benefit or privilege by law.

**COUNSELING REPORT — INDIVIDUAL COMPLAINT**

**PART I (Through Initial Interview)**

(Follow separate instructions and use a continuation sheet if necessary)

| 1. Regional Complaints Center Name, Address and Telephone Number | 2. EEO Officer Name, Address and Telephone Number | 3. EEO Counselor Name, Address & Telephone Number | 4. Date Counseling First Sought |
|---|---|---|---|
| TEL: (202) 377-6730 Washington Regional Complaints Center 800 K Street, N.W, Washington, D.C. 20001 | David F. Morrell U.S. Secret Service 1800 G St.NW, Rm 850 Washington, D.C. 20223 TEL: (202) 435-5780 | Isaiah Mapp, Jr. U.S. Secret Service 1800 G St.NW, Rm 740 Washington, D.C. 20223 TEL: (202) 435-5838 | 1-24-92 |

5. Date of First Interview  1-24-92

| 6. Employee or Applicant: Name, Business or Home Address. | 8. Matter Causing Complaint or Issue | | |
|---|---|---|---|
| Employee: Official title, Series & Grade. Ann M. Mogenhan - USSS 1310 L Street, N.W., Rm. 670 Washington, D.C. Management Analyst - GS-0343-11 | ☐ Appointment | ☐ Pay | ☐ Training |
| | ☐ Assignment of Duties | ☐ Promotion | ☐ Within Grade Increase |
| | ☒ Awards | ☐ Reassignment | ☐ Working Conditions |
| **7. Basis or Type of Discrimination** | ☐ Change to Lower Grade | ☐ Reinstatement | |
| ☐ Age | | ☐ Removal/ Separation | ☐ Other (Explain) |
| Date of Birth  ☐ Religion  ☐ Color  ☒ Race | ☐ Classification | ☐ Reprimand | |
| _____ D/M/Y _____ | ☐ Conv to F/T CC | ☐ Resignation | |
| | ☐ Duty Hours | ☐ Retirement | MAR 25 1992 RECEIVED |
| ☐ National Origin  ☒ Sex  ☐ Other | ☐ Eval-Appraisal Merit Pay | ☐ Sexual Harassment | |
| ☐ Retaliation/ Reprisal for Involvement in Complaints Process | ☒ Eval-Appraisal Non Merit Pay | ☐ Suspension | |
| Handicap: ☐ Mental ☒ Physical | ☐ Exam/Test | ☐ Termination During Probation | |
| Heat Triggered Migraine Headaches | ☐ Harassment | ☐ Time/Attendance | |
| | ☐ Overtime | | |

9. An EEO Counselor cannot reveal the identity of a person who has come for counseling, except when authorized to do so by the person counseled. Is Complainant willing to have his/her name revealed during the counseling stage? Yes ☐ No ☐. If answer is "Yes," Complainant must give permission by signing name in the space following:

_____
Signature of Complainant

| 10. Organization Where Alleged Discrimination Occurred and Date of Occurrence.  U.S. Secret Service  1/22/92 | 11. Give date Complainant became aware of alleged discrimination if substantially different from that shown in 10. Explain. |
|---|---|

12. If complaint appears to be untimely, what explanation is offered to explain why Counselor was not contacted within 30 days?
    N/A

13. Provide a brief description of complaint, summarizing actions which caused counseling to be sought and which complainant believes are discriminatory. On 1-22-92, Ms. Mogenhan received a response to an agency grievance, filed in August 1991. The grievance filed by Ms. Mogenhan was in regard to her 1991 Job Performance Appraisal, and was not resolved to her satisfaction. As a result of her grievance, which asked for a listing of specific job elements, and that her appraisal scores be raised in four (4) specific elements, Ms. Mogenhan sought EEO counseling. Ms. Mogenhan believes that denial of her grievance is discriminatory because her previous performance appraisal was rescinded. She believes she received a low performance appraisal and no cash award because of her race, sex, and handicap = (heat triggered migraine headaches).

14. Remedial Action Desired by Complainant
    Raise Evaluation Score from 270 to 300.
    Receive Cash Award.

15. On the same matter has Complainant filed a grievance under a negotiated grievance procedure? Yes ☐ No ☒
    Under the Agency grievance system? Yes ☒ No ☐
    Has Complainant appealed to the Merit Systems Protection Board? Yes ☐ No ☒
    If grievance or appeal has been filed, what is its status?

| 16. Does Complainant elect to have a representative? Yes ☐ No ☐ Unknown | 17. Signature of Counselor and Date Signed _____ 3/23/92 |
|---|---|

TD F 62-03.1 (03/87) PREVIOUS EDITION TD F 67.13.1 (06/85) OBSOLETE.

19

## AFFIDAVIT

Washington

District of Columbia

I, Ann M. Mogenhan, an employee of the United States Secret
Service, do solemnly swear:

I have been employed by the United States Secret Service from
September 23, 1990 to the present, and was initially hired as a
GS 9, series 343 Management Analyst in the Policy Analysis and
Records Systems Branch of the Management and Organization
Division, located in Washington, D. C.   Prior to my employment
with the Secret Service, I was employed by the Social Security
Administration in Baltimore, Maryland for 18 years.

My immediate supervisor in the Policy Analysis and Records
Systems Branch (PARS) since my employment has been Branch Chief
John Machado.  Mr. Machado interviewed me for this position, and
told me that I would be hired as a GS 9, but that after three
months, could be promoted to a GS 11 level if my work was "up to
par".  Mr. Machado told me that my experience which was included
on my SF 171 indicated to him that I was more than qualified for
the position at the GS 9 level.  I was told by Mr. Machado that I
would be responsible for records scheduling, and the review of
classified information for retention/destruction determinations.
I did not discuss with Mr. Machado the Secret Service employee

Page 1

73

evaluated when I had never received my job elements and therefore did not know what performance was expected of me.   I also told him that I had not received a mid-year review.   Mr. Machado told me that employees are not given job elements, in that the Secret Service is an exempted agency, and not required to follow OPM rules.   Mr. Machado then showed me a copy of my job elements, compared the elements and numbers with those on the appraisal, and told me that I was on target for my next evaluation to be outstanding.   I told him that based on the lack of job elements, and missing mid-year review, I would grieve my evaluation, because I felt that I could have done better had I known what the elements were.

Sometime after that meeting, I contacted Personel Division, and arranged a meeting with Shelia Lumsden and her supervisor, Joyce Sowa.   They told me that the Service fell under OPM regulations, and that giving employees their job descriptions and mid-year reviews were required by the agency.   They suggested that I contact a Service Ombudsman to resolve the problem.    On August 9, 1991, I filed a formal grievance concerning my evaluation based on this issues discussed above.

After I filed the grievance on August 9, 1991, Mr. Machado's entire attitude about me changed.   Tad King, a supervisory GM 13 in my office, told me that "John"  didn't feel that my work was timely or up to par.   Tad told me  "you know that John is just

angry with me.  A co-worker, George Pomeroy, approached me after one of these staff meetings, and asked me what was going on between Mr. Machado and myself.  George said, "What is going on? There was a lot of anger in there.  Why is John so angry at you?".

On October 1, 1991, John Machado called me into his office, and told me that based on the grievance I had filed,  I would be given new job elements, and that a new rating period would begin that day.  My next rating would be given in 90 days, and my previous evaluation was being rescinded.  I noticed that the grade level of GS 9 had been scratched out, and changed to GS 11 on the evaluation cover sheet.  I asked Mr. Machado where the SF 52 personnel action was, as I had not received one advising me of my promotion to a GS 11. I also realized that a new pay period had begun, and that a promotion could not be effective for another two weeks.  Mr. Machado assured me that based on my grievance, I had received the promotion, and that the new rating period had begun.

Sometime after October 1, 1991, I asked Gene Gibson, the fact finder assigned to my grievance, if the grievance was supposed to be confidential.  He told me that it was, but then also jokingly said "but you know how the Service is".  During this same time period, I was approached by another Secret Service employee in PARS who congratulated me on getting promoted as a result of the grievance I filed.  After I questioned him, he told

77

was indeed confidential, and that she would attempt to stop any
further dissemination of the information.

On October 16, 1991, I was called into Rob Keefe's office, who is
the Chief of the Management and Organization Division. John
Machado was present during this meeting. Mr. Keefe stated that
he "was real ticked off" that I had gone over his head in
contacting Susan Tracey, and not going to him. I told him that I
didn't trust him because he could be part of the problem. Mr.
Keefe told me that he was concerned that I was an employee that
did not want to work for the Secret Service, that I had a bad
attitude, was not happy, and was not doing what I was hired to
do. He also told me that maybe I should go out and find another
job. Mr. Keefe told me that I lacked the communication skills to
do the job here that I was being paid to do. I replied that I
did not trust the chain of command, and taking the advice of an
Ombudsman, went directly to Susan Tracey with my concerns. At
this point, Mr. Keefe and Machado became very irrate, and Mr.
Machado began yelling at me for implying that he was a lier. I
told them that I would not tolerate being spoken to as if I were

Page 6

78

a two year old child, and left the meeting.

On January 14, 1992, an area of Washington, D.C. located near my office at 1310 L Street was experiencing flooding and problems associated with what I believe was a broken water main.  I even recall seeing an area of street near the building that had broken open, and was visably flooded.  Rena Blue and I left the building to go to lunch, and at approximately 1:50pm, upon returning to work, we passed a fellow employee from Procurement Division who told us that the building was closed, and that employees had been told to go home.  As we got closer to the building, a Special Officer in the garage told us that the building was closed.  We entered the lobby, passed employees who appeared to be evacuating the building, and the Special Officer at the desk again told us that the building had been closed due to the water problem, and that the employees had been released to go home.  I asked permission to go upstairs and lock up my work area.  The Special Officer told me that I would have five minutes to accomplish this, but if I stayed any longer I would be asked to leave.  I went upstairs and secured my work area.  I walked around the office area, and saw no one there except for Carolyn Weisner.  I did not stop to speak to her.  After going back downstairs, and being told again by a Special Officer that a teletype had been sent out dismissing all but essential personnel, I left the building around 2:10pm and returned home.

On January 15, 1992, John Machado called me into his office.

79

Machado went on to say the we were the only three employees who had left the building, that Assistant Director Lee was aware of the situation, and that the Assistant Director had authorized that we be placed on AWOL.  He further advised us that this disciplinary action was with the concurrance of Susan Tracey. Mr. Machado told us that he would get back to us after he wrote up the AWOL charge.

Later that day, an employee in Inspection gave me a copy of the teletype which had been issued on January 14th advising of the building closure.  I was unable to locate a copy of the teletype in the Management and Organization Divison, nor could I locate a copy in the PARS Division.

On the same day, I received a message from Mr. Machado requesting a written statement before the close of business regarding our leaving on the day before.  After a staff meeting that day, instead of a written statement, I gave Mr. Machado a copy of the

80

appraisal was making it very difficult.

After this meeting, I called Personnel Division and talked with
Joyce Sowa.  She told me that Assistant Director Lee had not yet
signed off on my grievance, although it was acceptable practice
to sign off on a rating prior to receiving a final decision.  I
went back to Mr. Machado, and told him that Assistant Director
Lee had not signed off on my grievance, and that I would stand by
my refusal to sign the appraisal.

Mr. Machado became irritated, and asked me what I wanted in my
job.  I replied that I wanted enough work that was commensurate
with my job level.  He told me that I should leave for another
job if I couldn't be satisfied doing PARS work.  Mr. Machado told
me that in order to keep me busy, and to keep me from "running my
mouth", he would give me the entire Administrative Manual as part
of my assignment.  Then Mr. Machado told me that I would be
restricted to an 8:00am-4:30pm shift if I didn't elect to go on
the compressed work schedule.  I felt that Mr. Machado was
threatening me as my current hours are compatible with my
commuting schedule.  Finally, Mr. Machado brough up the AWOL
incident again, and wanted to know why I didn't provide him with
the write up about the incident that he had requested.  I refused
to discuss it with him because I didn't know what his reaction
would be.  I just sat there and didn't respond.  Mr. Machado
jumped out of his chair, and banged on the desk.  I walked out of
his office.

82

getting Rob Keefe to listen". Doug James told me that Sleasman was unable to substantiate the AWOL charge, but continued to be adamant that the three of us (Rena, Darnelle, and I) were "troublemakers". Doug James told me that Rob Keefe would not back down.

John Machado continued to harrass me through character assassination in front of my fellow employees. At one time, he yelled at me in front of Rena, saying "You're not civil, you're never civil, you don't want to follow the rules". Rena was visibly shaken after witnessing this tirade, and she walked out of the meeting as it upset her.

Sometime during this period, Doug James told me that the AWOL had been removed from our files, and that we had been credited with the hours of leave. I asked Doug for something in writing which rescinded the Memorandum of Counseling. Doug James said that the memorandum was part of a two part deal, and that it had not been removed from the file as yet.

Page 12

$84$

On February 27, 1992, I asked Doug James to assist me in obtaining a reasignment.  I also asked him to speak with the Assistant Director and Rob Keefe to explain that I was sick and tired of the treatment I was receiving, and that John Machado be put on notice that the behavior should cease.  I refused to personally meet with John Machado because I felt physically threatened by him because I didn't know what he would do.

I have experienced heat-triggered migraines, which are caused primarily by being in closed spaces with poor ventilation, since March of 1985.  I have been under continuous Doctor's care since that time, and have taken various medications and have practiced bio-feedback in order to combat the headaches.  My handicapp is documented through Department of Labor Workmen's Compensation Forms that have been filed with both the Social Security Administration and the Secret Service.  I have provided documentation which substantiates this handicapp.  Since I have never been employed as anything other than a Federal employee, my handicapp has never been certified on a state level.

When I was appling for my position with the Secret Service, I told Mr. Machado in an interview about my condition, and questioned the ventilation of the building in the area in which I would be working.  During my background investigation, Mr. Machado contacted me several times to clarify my workman's compensation situation, and my condition was well supported.  Mr. Machado told me that my requests for accomodation from the

Page 13

$85$

KWM

Service in allowing me to go out on workman's compensation if I
became ill, or to a leser degree of severity, to leave my
workstation and go outside for fresh air, would be no problem.
Mr. Machado was supportive and concerned, and was aware that both
my annual and sick leave balances fluctuated in relation to the
amount of time credited to these accounts through workman's
compensation after I had been absent due to illness.  In
addition, I always attached Doctor's notes to my leave slips when
submitted after an illness.

Shortly after I had filed the grievance, and had run out of leave
due to the handicapp, Mr. Machado gave me a lecture about putting
me on leave restriction.  I explained my options to him under
workman's compensation, for example..leave without pay, and
explained to him that I was not a leave abuser.  There were other
times that I had been out of leave and ill prior to the time I
filed the grievance, and he had never mentioned leave
restriction.  I have not advised anyone in the Secret Service
about the handicapp other than the agents who conducted my
background investigation, and Mr. Machado.  My condition was
brought to Rob Keefe's attention during a meeting with the
Ombudsman regarding Mr. Machado's intolerance of my leave
balances.  Until that meeting, Mr. Keefe stated that he was
unaware that I was on workman's compensation.

I believe that in addition to harrassing me about my leave
balances, Mr. Machado's perception of my condition is that it is

86

testified before Congress about activities that had occurred at
the Social Security Administration, and I felt that in doing
this, Ann showed courage and an ability to stand up for what was
right.  Ann did not indicate to me that she had a medical
handicap, nor was it mentioned in any of the paperwork
she completed in connection with her background investigation.
Barbara Watts, the specialist in the Personnel Division who was
responsible for Ann's application, told me that Ann's leave
record with the Social Security Administration was suspect.  I
chose to overlook Ann's leave record, and hired her primarily to
analyze Service policy developed and proposed, and to work with
record schedules.

I am aware that the Secret Service is not exempt from Office of
Personnel Management regulations, and I never told Ann that OPM
regulations did not apply to the Service's Employee Appraisal and
Evaluation Policy.  I have received instruction about this policy
from Management and Organization Chief Rob Keefe, and Deputy
Chief, Jim Sleasman.  Ann and I spoke continuously about her job
duties, and what I expected of her from the time she was hired.
After she had been on the job for several months, I advised her
of her job elements and standards.  A position description had
been attached to SF52, Personnel Action, which I know she
received.  The process of advising an employee of these elements
is rather informal, and I failed to have her sign the SSF 3054,
employee appraisal cover sheet, at that time.  Ann was not
unaware of her job elements and standards.

*103*

I sat down with Ann sometime in February 1991 for a mid-year review, which is also required by Secret Service policy. We talked about the performance standards for the Management Analyst position, and that the position changed with grade level only in the amount of supervision that was required of an employee to perform their work. We discussed plans I had to tailor the position description specifically to each employee, and she asked me questions about this proposal. We had no misunderstandings, no problems, and I felt that things were going well. Ann was doing a good job. Once again, I did not have her sign the SSF 3054, indicating that she had received the mid-year review. Not withstanding, she had been on board for a short period of time, I made a mistake by not having her sign the form.

It was shortly after the mid-year review that I had my first indication that Ann was having a problem dealing with people. She had attended a "Diversity" class for women employees, and I received reports back that she was continually "bitching" about the Secret Service, and complaining about management and the structure of the agency. I called her in and asked her about the things I had been hearing about her attitude. I told Ann that she needed to make the effort to get along with people, or that she'd have problems in her job. She stated to me that other people needed to change, not her.

Shortly after that I selected Ann to represent the Management and Organization Division in the Combined Federal Campaign. I

_104_

On July 25, 1991, I called Ann into my office for the year end
evaluation.  I gave her what I thought was a good rating for the
first year, 300.  She did a fantastic job on the Correspondence
Manual, which had been an ongoing project assigned to her, and
which we discussed on a regular basis.  I gave her a 4 rating in
that element, which is the outstanding category.  I gave her a 2
rating in communication skills - had her work not been as good as
it was, she would have had a problem.  I told her that she needed
to be less abrupt and listen to people in order to bring her
evaluation score up.  Ann did not say anything about not having
received her elements or mid-year review, and did not mention
filing a grievance.

When I found out that Ann had filed a grievance, I was
blindsided, in fact, all of us were.  We went back to find out
what the grievance was about, and I discovered that I had failed
to have Ann sign the SSF 3054.  I admitted that I had made a
mistake and had done it wrong.  Management and Organization
Division agreed with Personnel Division to drop the evaluation,
and to re-evaluate Ann in 90 days.

Ann's attitude about the Secret Service and management continued
to decay.  She became distant to almost everyone, and indicated
that everyone in management was out to get her.  This included
her relationship with Tad King and Ann Parker.

Tad King and I discussed the problem with Ann's attitude several

Page 5                           *106*

painstakingly went through every line of her performance standards, almost to the point of ridiculousness. Ann refused to sign the SSF 3054 acknowledging the receipt of the standards and elements. I have no idea why she refused to sign.

Ann continued to have problems with Tad and with me. Ann doesn't communicate, she tells you what she thinks. She is fine with people who agree with her. Ann cannot tolerate people who disagree with her, and will argue her points to death. I really don't recall the meeting with Rob Keefe on 10/16/91, as specified in Ann's affidavit. We had alot of meetings. On several occasions I have raised my voice at her, usually to match hers.

On 1/14/92, I came to work in the morning to discover that there was a water pressure problem in the building that had been caused by a broken water main in downtown Washington. Rob Keefe told us that he had discussed the situation with the Assistant Director of Administration, David Lee, and that employees would not be dismissed from work. I told my employees in the branch that morning that I would advise them if there was a change in status. I don't know if Ann was present then or not, but I do know that Rena Blue was, and heard me say this.

Around 1:00pm, Ann, Rena Blue and Darnelle Sneed left for lunch. Around 2:00pm, I realized that they had not returned, and had left for the day. All the supervisors in the Division were on the 7th floor during that time period, and it had been explained

Page 7                          *108*

Jim Sleasman and I went to Personnel and spoke with Sheila
Lumsden and Joyce Sowa for guidance in how to proceed.  I felt
that I needed to take some type of action because my other
employees had remained at work that day.  We talked about
charging the women with AWOL, which would have been appropriate.
I personally wanted to write a Memorandum of Counseling, and
Personnel concurred that a memo was also appropriate.

1/16/92 was the end of Ann's 90 day rating period.  I arrived at
work that day around 7:30am, and saw Ann in the lobby of 1310 L
Street.  Ann was on the compressed work schedule, and was
supposed to be at work at 7:00am.  I was under the impression
that she was late.  I asked her to come to my office, and told
her that I had given her a rating of 270 for the period.  She had
received a 300 rating before because she had been working on the
Correspondence Manual, and had done an excellent job.  She no
longer had a project of that scope, and had no outstanding work.
I rated her commendable in Administration, which went down from a
4 to a 3.  The communication element went from a 3 to a 2,
because she wasn't communicating successfully with anyone at this
point. In fact, much of her communication with Tad by this time
was in the form of written notes.  I never made the statements
that Ann attributes to me in her affidavit.  Actually, it was a
one way conversation, Ann said very little.  I did not bring up
the AWOL incident.  I asked her what she wanted, and she answered
that she wanted work assignments commensurate with her skills.  I
told her that I would give her additional assignments.  I did

110



give her alot of the Administrative Manual.  I felt that she was
capable of doing the work.  I never felt that she was overworked,
and she never complained.  I also told her that she had been late
to work that morning, and if she couldn't get there on time, that
I'd recommend that she be taken off of the compressed work
schedule.  This had already happened to an employee in another
branch of the Division.  Ann refused to sign the evaluation, and
walked out of my office.  There had been no mid-year evaluation
because this rating was for the 90 day period beginning 10/1/91.

On 1/21/92, Ann, Darnelle and Rena were called in to meet with
Rob Keefe and I.  Rob told them that he was going to charge them
with AWOL, and I agreed with his decision.  The more that we
looked into the situation and discussed it, the more clearly it
appeared that their intent had been to take advantage of the
situation.

On 1/24/92, the Memorandum of Counseling, which I had written and
signed, and which was approved by Jim Sleasman for Rob Keefe was
given to the women.  These memorandums remain between the
employee and me as a means to document a discussion.  At
someone's suggestion, I asked Ann to initial the memo to
acknowledge her receipt of it.  Ann told me that I could find it
in the trash.

At some point, Ombudsman Doug James and Assistant Director Lee
became involved, and with Rob Keefe, decided to drop the AWOL

///

charges.

Ann exhibited the most bizarre behavior I have ever seen in any
individual.  Ann Parker, who bends over backwards to help others,
made what I considered to be a friendly comment to Ann about
attending opening day of baseball season.  Ann Mogenhan accused
Ann Parker of prying in her personal business.  Ann Parker came
to me after, and told me that Ann Mogenhan had been extremely
rude to her, and that Ann Parker no longer wanted to make any
attempt to speak with her.  I've never discussed Ann Mogenhan
outside of the management structure, which includes Ann Parker
and Tad.  At this point, I'd lost all faith in my ability to deal
with Ann Mogenhan.

With reference to Ann's heat triggered migraines, there had been
nothing on her SF 171 to indicate any type of physical handicap,
nor did she advise me of any history of migraines.  She would
call in to say that she had a migraine, but never mentioned that
they were heat triggered.  Never once do I recall Ann becomming
ill at work, and having to go home.  She always called in sick,
usually on Mondays, away from the office.  Ann always came in
with a Doctor's slip attached to her leave slip, and after she
started buying back her leave, would also note her workman's
compensation claim number on the leave slip.  In spite of the
leave, Ann was still able to get her work done.  She kept up.
The last thing that I would want to do is stress any of my
employees.  That in turn would cause more stress for me.  Ann got

112

promoted on time, after a year in grade.  Her evaluations were acceptable-outstanding and commendable ratings.  Her only problems were in communication and interpersonal relation skills, which I made attempts to counsel her on in my role as her supervisor.  Ann never asked for any accommodation from the Service because of the headaches, and never told me that there was a problem interfering with her work.  My only indication came from the Doctor's notes which specified that they were "heat triggered".  There was no discussion regarding ventilation during the hiring process.  I have suspected that Ann has attempted to document the migraines in order to pursue a disability retirement.

The time and attendance clerk, Rob Keefe, Jim Sleasman, and I are the only employees with access to Ann's leave balances.  I have only discussed Ann's leave balances with Jim Sleasman and Rob Keefe, and some of these discussions centered around Ann's requests for advanced sick leave instead of LWOP when she ran out of leave. I noted that there was an increase in leave due to headaches when Ann's leave balances were replenished through the workman's compensation buy back.

As a courtesy, the employees tell me where they are going to be during the day.  At a staff meeting, I asked them to use the sign out board.  One day, I couldn't find Ann for two hours.  I needed to ask her a question.  I found her in the snack bar with Rena Blue.  Other times she has told me that she has gone to 1800 G

113



felt that the memorandum was the least we could do in that the employees had not made the extra effort to contact a supervisor, and confirm the dismissal.  Rob Keefe asked that I write up the memorandums, and sign them on his behalf.  This action was not discussed with the Employee Relations Branch.  The hours that had been charged to AWOL were changed on the time cards in the Division to Administrative leave.  No sick or annual leave was charged to their leave balances.  I do not recall ever having charged any other employee in this division with AWOL prior to this incident.

I do not recall having any information about Ann having migraine headaches prior to her coming on board.  After she started work here, she used a lot of leave, approximately one and a half days per week.  Ann always had a Doctor's certificate attached to her leave slips, and also had a Workman's Compensation Case number noted on all her leave slips.  When Ann's leave balances became low, she was able to buy back hours through workman's compensation.  It seems as though her instances of sick leave decreased when her leave got low.  When the hours were reinstated, she would begin using large amounts of leave again.

Ann never asked for any kind of accommodation because of her headaches.  She once asked that we purchase a special stool for use in her workplace because she had back problems.  We purchased the stool, and the issue of back problems was not presented again.

138